UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
RENAISSANCE DEVELOPMENT CORP., )
)
    Plaintiff, )
)
v. )   Civil No. 18-11792-LTS
)
BUCA V, LLC, BUCA, INC., BUCA )
RESTAURANTS, INC., BUCA C, LLC, )
and PLANET HOLLYWOOD )
INTERNATIONAL, LLC, )
)
    Defendants. )
)

ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. NO. 24)

July 9, 2019

SOROKIN, J.

    Two of the defendants[1] leased a property in Shrewsbury, Massachusetts from Renaissance Development Corp. ("Renaissance") for the purposes of opening a restaurant. Thereafter, the parties entered into multiple amendments into the lease, with additional defendants acting as guarantors. After a first round of litigation in this Court, the parties entered into a Forbearance Agreement in April 2016 which altered some of the provisions of the lease. In August 2018, Renaissance initiated a second suit in this Court alleging that the defendants breached both the lease and the Forbearance Agreement. For the reasons that follow, Renaissance's motion for partial summary judgment is DENIED.

---

[1] Given that most of the defendants share similar names, for the sake of clarity, the Court abbreviates their names as follows: Buca V, LLC ("Buca V"), Buca, Inc. ("Buca"), Buca Restaurants, Inc. ("BRI"), Buca C, LLC ("Buca C"), and Planet Hollywood International, LLC ("Planet Hollywood").

I.   BACKGROUND

   A.   The Lease

Renaissance owns a property located in Shrewsbury, Massachusetts ("the premises"). Doc. No. 33 ¶ 3. Renaissance and Buca V are parties to a Commercial Property Lease ("the lease") in which Renaissance rents the premises to Buca V for the purpose of opening a restaurant.[2] Id. The following portions of the lease are relevant to the resolution of the pending motion.

>   Section 5.5(a) of the lease requires the lessee, Buca V,
>
>   to make all repairs, alterations, additions, or replacements to the [premises] required by any law or ordinance or any order or regulation of any public authority because of Lessee's use of the [premises], to keep the [premises] equipped with all safety appliances and equipment so required because of such use; to procure any licenses and permits required for any such use; to pay all municipal, county, or state taxes assessed against the leasehold interest hereunder, and to comply with the orders and regulations of all governmental authorities . . .

Doc. No. 25-1 at 11. Section 5.5 (g) requires the lessee

>   not to abandon or vacate the [premises] during the Initial Term or any Extended Term; provided, however, that Lessee shall not be deemed to be in violation of this covenant if Lessee shall vacate the [premises] for a period not to exceed six (6) months so long as Lessee is actively attempting to assign or sublet the Lease and the Lessee is not otherwise in default of this Lease. This section shall not apply to any period related to an event of damage by fire, casualty, condemnation or otherwise, nor to any period in which the restaurant is closed because Lessee is changing the concept of said restaurant.

Id. at 12. Additionally, the lease contains a cure provision which sets forth the timeline upon which the lessee is required to cure any breaches of the lease. Section 15.2 states that

>   [i]f: (a) Lessee shall fail to perform or observe any other term or condition contained in this Lease and such failure is not cured within thirty (30) days after

---

[2] The history of the parties to the lease is a bit more complicated and involves numerous assignments of rights over a period of nine years. See Doc. No. 33 ¶¶ 2-6. The relevant portions of this history are that defendants Buca and BRI were each, at previous times, the lessee. As of January 1, 2014, Buca V became, and remains, the lessee. Id. ¶ 10.

2

> notice thereof or such longer period of time as is necessary to effect the cure so long as Lessee has used and continues to use all due diligence to effect the cure . . .
> (d) then, the Lessor shall have the rights and remedies provided for in Section 15.3.

Id. at 24-25.

B. The First and Second Amendments

In August 2010, Renaissance and BRI (who was at that time the lessee) entered into the First Amendment. Doc. No. 33 ¶ 7. "Among other things, the First Amendment changed the rent payable by BRI to [Renaissance] and extended the term of the Original Lease from May 31, 2011 to May 31, 2020." Id. ¶ 8. The First Amendment also contained a provision which stated that "[e]xcept as amended hereby, the Lease is ratified and remains in full force and effect." Doc. No. 25-2 at 7.

In January 2014, BRI assigned its rights and interest in the lease to Buca V. Doc. No. 33 ¶ 10. In September 2014, Renaissance and Buca V entered into the Second Amendment. Id. ¶ 11. "The primary purpose of the Second Amendment was to comply with an earlier request by [Buca V], Buca and BRI to remove [another premises] from the Lease." Id. ¶ 12. Under the Second Amendment, Buca V remains liable for the full amount of rent owed under the lease. Id. ¶ 14. The Second Amendment also contained a provision stating that the lease remained in full force and effect, except as amended therein. Id. ¶ 15.

At the same time that Renaissance and Buca V executed the Second Amendment, Buca and BRI entered into a Guaranty ("2014 Guaranty") whereby they guaranteed performance of the lease, as amended. Id. ¶ 13.

C. The First Litigation

Within a few months, Buca V ceased making payments under the lease and vacated the premises. Id. ¶¶ 16-17. Thereafter, Renaissance filed an action in this Court alleging that Buca

V breached the lease and that Buca and BRI breached their obligations under the 2014 Guaranty. Id. ¶ 18. This Court entered judgment in favor of Renaissance on all counts. Id. ¶ 19. The defendants appealed the judgment, but then settled their dispute by entering into a Forbearance Agreement with Renaissance on April 1, 2016. Id. ¶¶ 21-22. The Forbearance Agreement was signed by a representative from the five defendants in this matter. Doc. No. 25-7 at 8. Planet Hollywood and Buca C also executed a guarantee ("Forbearance Guarantee") of Buca V's obligations to Renaissance under the lease and the Forbearance Agreement. Doc. No. 25-8.

The Forbearance Agreement includes a provision in which Renaissance agrees to allow Buca V to pay $25,000 per month ("Monthly Forbearance Payments"), rather than the previously agreed-upon monthly rent of $36,299.23 ("Monthly Rent Payments"). Doc. No. 25-7 at 4. However, the Forbearance Agreement also provides that if any of the defendants default under the lease or the Forbearance Agreement, then Renaissance's acceptance of the lower monthly payment shall be voided. Id. In that case, the defendants will be liable to Renaissance for the difference between the Monthly Forbearance Payments and the Monthly Rent Payments from April 1, 2016 through the date of the default—approximately $11,000 per month. Id.

    D.    <u>The Present Litigation</u>

At the time the Forbearance Agreement was signed in April 2016, neither Buca V nor any of the other defendants were occupying the premises. Doc. No. 33 ¶ 28. However, a number of aesthetic and structural problems had arisen with the premises, perhaps in part due to the fact that it was unoccupied. The need for repairs, the efforts the defendants have and have not taken in that respect, and the fact that the premises have remained unoccupied for over three years form the general basis for the present litigation. Accordingly, the Court reviews the evidence submitted by the parties with respect to these issues and recounts the facts in the light most

favorable to the defendants, in accordance with the standard applicable to motions for summary judgment.

In October 2016, Renaissance[3] was contacted by the Town of Shrewsbury ("the Town") about repairs the Town felt were needed to the premises. Doc. No. 25-9. These included concerns that work was done on the building without a permit and that the building was not "secure and weather tight," and the Town instructed Renaissance to contact the fire and police departments "for the history of problems" at the premises. Id. Renaissance thereafter requested from the defendants "a written report on the status" of the issues identified by the Town. Doc. No. 25-10. In November 2016, the Town also sent Renaissance a "Trash Accumulation Complaint" identifying violations of Town codes based on the accumulation of trash and debris at the premises. Doc. No. 25-11.

Thereafter, Renaissance forwarded the complaint to the defendants and provided an additional five items it wished the defendants to repair, along with pictures of the problems it identified at the premises. Doc. No. 25-12. That list included: "1. Clean up trash located at property[,] 2. Repair rotted wood on building exterior[,] 3. Repair light fixtures[,] 4. Fix Electrical System[,] 5. Repair Building sprinkler system but to not activate per discussion onsite." Id. at 2. Additionally, a follow-up email from Renaissance contained notes about an "on-site meeting" in November which appears to have included representatives from Renaissance, the defendants, and the Town. Doc. No. 33-3 at 12. In January, a representative from the defendants confirmed that some progress had been made on the repairs noted at that on-site meeting, and that additional efforts were underway to fix the rest. Id. at 13.

---

[3] The emails received and sent were by "The Jan Companies," which the Court understands to be indistinguishable from Renaissance for purposes of resolving the pending motion. Accordingly, for clarity, the Court refers to all communications as being sent and received by "Renaissance."

5

On January 30, 2017, the Town sent Renaissance another letter notifying it of problems with the status of the sprinkler and fire alarm systems at the premises, as well as the lack of a building permit for the repairs needed to make the building weather tight. Doc. No. 25-14 at 3. A few days later, Renaissance forwarded the letter to the defendants, in an email which also stated that the "required installment payment and monthly forbearance payments [were] past due." Id. at 2. On February 20, 2017, the defendants sent the Town and Renaissance a letter detailing the "security monitoring plan" they had implemented at the premises, which included the installation of a fence for security. Doc. No. 33-7. In March, the defendants sent emails to Renaissance letting them know about their progress regarding the fence and asking for Renaissance's signatures on paperwork necessary to obtain the permit. Doc. No. 33-4 at 2-3.

On August 11, 2017, Renaissance sent the defendants a Notice of Default ("the First Default Notice") which stated that the defendants were in violation of sections 5.5 and 6.1 of the Lease—the sections regarding maintaining and repairing the premises. Doc. No. 25-16. The First Default Notice also contained a list of twenty-one repair and maintenance items which Renaissance demanded the defendants fix within thirty days. Id. at 4. The Deputy General Counsel for the defendants replied on August 24, 2017 "with a letter stating that certain of the repairs and maintenance items referenced in the Notice of Default would take longer than 30 days, and he promised to provide periodic updates on the progress of the work." Doc. No. 25-17 at 2. On September 12, 2017, Renaissance sent the defendants a second Notice of Default ("the Second Default Notice") which referenced the First Default Notice and the defendants' response. Id. The Second Default Notice demanded "a list of all defaults that were cured within 30 days of the Notice of Default, a list of all uncured defaults, a description of the work performed on each uncured default, and the date on which each uncured default will be completed." Id. at 2.

On November 1, 2017, the defendants sent Renaissance an email with a "summary chart" of the investigation into each of the twenty-one repair items and the projected timing for completing each. Doc. No. 33-4 at 10. In early 2018, the parties exchanged additional emails regarding the ongoing repairs at the premises, including problems the defendants had experienced with contractors and weather. See Docs. No. 33-6, 33-4, 25-18. On March 30, 2018, the defendants sent Renaissance a letter summarizing the problems they had encountered which had delayed the repairs. Doc. No. 33-6 at 5. Those problems included construction of a bridge nearby, water damage from a burst sprinkler head, disputes with an insurance company, and delays in receiving permits from the Town for work to be done. Id. at 5-6. This letter was forwarded to the Town on April 2, 2018. In April and October 2018, the Town sent emails to Renaissance about the fact that it suspected work was being done on the premises without the appropriate permits having been obtained. Docs. No. 25-19, 25-20.

In June 2018, Renaissance received a check from the company insuring the premises for water damage which had occurred some months before. Doc. No. 33-8. Renaissance asked the defendants to sign the check and then return it for Renaissance to hold "in escrow until it is decided to best disburse funds for building repairs" at the premises. Id. On November 26, 2018, the defendants sent Renaissance an email stating that the Town had "finally granted [the defendants] a building permit" and asking for money from the insurance check to be released in order for the work to be completed. Doc. No. 33-9 at 5. The defendants followed up again on November 30 when they had not yet received a response about disbursement of the insurance money and attached the building permit. Id. at 2.

On August 22, 2018, Renaissance filed a Verified Complaint in this Court, asserting five counts against the five defendants and First Data Corporation, a "reach and apply" defendant.

Doc. No. 1. Count I asserts that Buca V breached the Lease "by failing to perform necessary maintenance and repairs, and by vacating the Shrewsbury Premises for more than six months." Id. ¶ 30. Count II asserts that Buca and BRI breached the 2014 Guarantee because of Buca V's breaches. Id. ¶¶ 35-39. Count III asserts that Planet Hollywood and Buca C breached the Forbearance Guarantee for the same reason. Id. ¶¶ 40-43. Counts IV and V are asserted against First Data and are not at issue in the pending motion.

Renaissance filed a motion for partial summary judgment as to liability only on Counts I, II, and III. Doc. No. 24. The defendants opposed. Doc. No. 32. The Court heard argument from the parties on June 27, 2019.

II.     LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute "is one on which the evidence would enable a reasonable jury to find the fact in favor of either party." Perez v. Lorraine Enters., Inc., 769 F.3d 23, 29 (1st Cir. 2014). "A 'material' fact is one that is relevant in the sense that it has the capacity to change the outcome of the jury's determination." Id. (citation omitted). The Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). However, the Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009).

III. DISCUSSION

    A. Alleged Breach of Lease

Count I alleges that Buca V breached the Lease "by failing to perform necessary maintenance and repairs, and by vacating the [premises] for more than six months." Doc. No. 1 ¶ 31. The Court considers each theory in turn.

        i. Failure to Maintain and Make Repairs

Renaissance argues that Buca V breached sections 5.1, 5.5(a), 6.1, and 15.2(a) of the lease by failing to perform necessary maintenance and repairs to the premises. Doc. No. 25 at 9. Section 5.1 requires that Buca V's occupation of the premises shall not "be unlawful or contrary to any State, Federal or local law or municipal by-law or ordinance in force in the Town[] of Shrewsbury." Doc. No. 25-1 at 10. As previously noted, section 5.5(a) requires Buca V, among other things, "to make all repairs, alterations, additions, or replacements to the [premises] required by any law or ordinance or any order or regulation of any public authority because of Lessee's use of the [premises] . . . and to comply with the orders and regulations of all governmental authorities." Id. at 11. Section 6.1 makes Buca V financially responsible for its "failure to maintain and repair the [premises] in accordance with its obligations" under the lease. Id. at 14. Section 6.1 also contains multiple provisions with respect to the roof and parking lot, regarding both repair and cost allocation. In particular, section 6.1 imposes upon Renaissance responsibility for repairing the roof, subject to cost sharing with Buca V via a formula in the contract, when the roof must be replaced or the parking lot must be resurfaced during the final three years of the lease. Doc. No. 25-1 at 13. Finally, section 15.2(a) sets forth the timeline for curing any breach under the lease, allowing "thirty (30) days after notice [of the breach] or such

9

longer period of time as is necessary to effect the cure so long as Lessee has used and continues to use all due diligence to effect the cure." Id. at 24.

The First Default Notice, sent by Renaissance on August 11, 2017, constitutes notice of breach for purposes of invoking the cure provision of the lease in section 15.2(a).[4] As of August 11, 2017, the defendants had notice that Renaissance considered them to be in breach of sections 5.5(a) and 6.1 of the lease by virtue of the twenty-one outstanding repair and maintenance issues identified in the First Default Notice. From that date, the defendants therefore had thirty days to fix any items in need of repair or "such longer period of time as [was] necessary to effect the cure," so long as they used and continued to use "all due diligence to effect the cure." Id.

The record before the Court shows that the First Default Notice contained a list of twenty-one items in need of repair or maintenance. Doc. No. 25-16 at 4. A few months later, the defendants provided Renaissance with a list containing a brief statement of any investigation they had done into each item and the time at which they expected repairs to begin. Doc. No. 33-4 at 10. The items Renaissance listed as needing repair can be separated into two groups: items involving the roof repair (including those which reasonably, drawing all reasonable inferences in Buca V's favor, could not be completed until the roof was repaired) and items independent of the roof repair.

As to the first category of items, those involving the roof repair, Renaissance's motion fails for several reasons. First, the Notice of Default was sent in August 2017, when less than three years remained under the lease, which expires in May 2020. At that point, Renaissance,

---

[4] There is some evidence in the record of discussions between Renaissance and the defendants about the repairs required prior to the First Default Notice. However, based on the summary judgment record, drawing all reasonable inferences in favor of the defendants, the timeline for the thirty-day cure provision begins on the date formal notice of breach was received by the defendants, which was August 11, 2017.

10

not Buca V, bore the burden of repairing or replacing the roof. See Doc. No. 25-1 at 13 ("if the roof . . . needs to be replaced . . . and less than three (3) years remain on the Term, Lessor, at Lessor's sole cost and expense, shall cause such roof[] . . . to be replaced . . . provided; however, (i) Lessee shall pay its prorate share of such cost by amortizing such cost over a ten (10) year period, with Lessee responsible for the period of the remaining Term of the Lease . . .").[5] While the lease imposed a cost sharing obligation on Buca V, the failure of Buca V to make the repairs after the First Notice of Default (when less than three years remained on the lease) is not grounds for summary judgment on Renaissance's claim.[6]

While there is some evidence in the record suggesting that the roof may have been in disrepair before the final three years of the lease, the record is insufficient to resolve this factual issue in favor of Renaissance on summary judgment and the parties have not addressed the application of the contract to the circumstance when the roof required repair with more than three years remaining while the notice of default issued with less than three years remaining. Notably, the defendants wrote in their response to Renaissance that they needed to "discuss possible solutions and cost allocation," which, for the foregoing reasons, is not a basis to enter summary judgment in favor of Renaissance. Doc. No. 33-4 at 10. Ultimately, it is

---

[5] This provision also made Renaissance responsible for resurfacing the parking area at the premises during the final three years of the lease, with the same cost sharing provision. Doc. No. 25-1 at 13. In the list of 21 repair items, Renaissance listed "Parking lot filled with potholes" as an item Buca V was required to repair. However, for the same reasons that the defendant's failure to replace the roof cannot provide a basis for summary judgment, neither can any failure on the defendants' part to resurface the parking area.

[6] From the text of the lease, it appears that although responsibility to replace the roof transferred to Renaissance within the three-year period before the lease expires, Buca V retained responsibility for repairing the roof throughout the duration of the lease. From the record before the Court, it is not clear whether the roof simply needed to be repaired, or whether it needed to be replaced altogether. In their papers, the parties discuss replacing the roof, rather than simply repairing it. See Doc. No. 25 at 7; Doc. No. 32 at 12; Doc. No. 36 at 6-7.

Renaissance's burden at summary judgment to prove that the defendants were responsible for repairing the roof and that they were not acting with "all due diligence" to do so. Renaissance has not met this burden, and therefore summary judgment is not appropriate with respect to the repair items which were related to the repair of the roof. Because a variety of other deficiencies noted in the First Notice of Default reasonably appear to require roof repair (e.g. making the building water tight, replacing sections of roof shingles, repairing leaking seals on the skylights) for these same reasons, Renaissance has not met its burden to any of the items in the first category.

As to the second category of items, those which were independent of the roof repairs (e.g. painting the building, strong odor of mold throughout the building, repairing the sprinkler and fire alarm systems), there is some evidence in the summary judgment record that the defendants were making progress on those repairs. Some repairs are listed as "completed," while others are "[s]cheduled to start work first full week of November." Id. The Court has no detailed information regarding the status of these repairs, the scope of the repairs, or the reasonable period of time required to complete such repairs. Resolution of these questions requires either an expert opinion or sufficient information in the record to make such determinations. The record does show Buca V taking some action as to these items, albeit not with blinding speed.[7] As the movant, Renaissance must establish by a preponderance of the evidence that the only conclusion

---

[7] The Court notes that for some of the items, no progress is listed as having been made or even having been scheduled to begin. However, based on the evidence before the Court, these items appear to be items which would reasonably follow the repair of other items. For example, item number 10 states that the "[b]uilding should be painted," but such a repair might not reasonably be expected to take place until other items, such as the trees damaging the exterior of the building or the damaged window awnings were taken care of. Accordingly, the fact that some items did not have repair work completed or even scheduled does not provide a basis for summary judgment in Renaissance's favor.

the evidence supports, while drawing all reasonable inferences in Buca V's favor, is that the defendants <u>did not</u> act with all due diligence in completing these repairs. Based on the evidence before the Court, Renaissance has not met this burden.

Therefore, the theory that Buca V breached the Lease by not making all necessary repairs is not a basis for summary judgment, but rather a trial question.

ii. <u>Vacation of the Premises</u>

Renaissance also argues that Buca V violated sections 5.5(g) and 15.2(a) of the lease by vacating the premises for over six months. Doc. No. 25 at 10. Section 5.5(g) requires the lessee, Buca V, not to vacate the premises, "provided, however, that Lessee shall not be deemed to be in violation of this covenant if Lessee shall vacate the [premises] for a period not to exceed six (6) months so long as Lessee is actively attempting to assign or sublet the Lease." Doc. No. 25-1 at 12. Section 15.2(a) is the previously referenced cure provision providing thirty days—or more, if the lessee is acting with all due diligence—from the date of notice to cure the breach.

In this case, neither the First Default Notice nor the Second Default Notice specifically mentioned the fact that the defendants were not occupying the premises. The cure provision in the parties' contract provides for a thirty-day period from the date notice of the breach is given. Accordingly, there remains a question of material fact as to whether Renaissance in fact invoked the cure provision.

Even if the Court considers the cure provision to have been invoked, there remains a fact question as to whether the defendants exercised "all due diligence" in attempting to cure their breach regarding vacation of the premises. At the hearing, counsel for Renaissance and counsel for the defendants both agreed that resolution of this theory turns on the Court's resolution of the theory that Buca V breached the lease by not making all necessary repairs. That is, if Buca V

13

was exercising all due diligence in making the necessary repairs, it was not in breach of the lease provision requiring it to occupy the premises because the premises were not in a condition suitable for occupation. As previously noted, a reasonable finder of fact could determine, based on the record before the Court, that the premises were not safe or ready to be occupied by the defendants (or another entity) for purposes of operating a restaurant, but that the defendants were exercising all due diligence in attempting to repair the problems. Accordingly, a reasonable finder of fact could also find that such actions constituted "all due diligence" for purposes of ensuring that the premises were reoccupied. The theory that Buca V breached the Lease by vacating the premises for over six months therefore is also not a proper basis for summary judgment.

The motion for summary judgment, Doc. No. 24, is DENIED as to Count I.

B.  Alleged Breach of 2014 Guarantee and Forbearance Guarantee

In the 2014 Guarantee, BRI and Buca each "guarantee to [Renaissance] the full and punctual payment and performance by [Buca V] of all the respective Obligations . . . to be kept and performed by [Buca V] under the Lease." Doc. No. 25-4 at 2. Count II alleges that Buca and BRI breached the 2014 Guarantee by virtue of the fact that Buca V breached the lease.

In the Forbearance Guarantee, signed in April 2016, Buca C and Planet Hollywood each "guarantee to [Renaissance] the full and punctual payment and performance by the Judgment Debtors of all of their obligations to [Renaissance] under (a) the Lease, (b) the Judgment, and (c) the Forbearance Agreement."[8] Doc. No. 25-8 at 2. Count III alleges that Buca C and Planet Hollywood breached the Forbearance Guarantee because Buca V breached the lease.

---

[8] The parties dispute which of the five defendants are included in the term "Judgment Debtors." See Doc. No. 33 ¶ 24. The Court understands the term "Judgment Debtors" to refer to the parties against whom judgment was entered in the First Litigation—Buca V, Buca, and BRI.

14

Counts II and III therefore both turn on the question of whether Buca V in fact breached the lease. Accordingly, for the reasons expressed herein, Renaissance's motion for summary judgment is DENIED on Counts II and III.

C. Alleged Breach of Forbearance Agreement

Renaissance also argues that the five defendants breached the Forbearance Agreement, which required them to pay the difference between the Monthly Forbearance Payments ($25,000) and the Monthly Rent Payments ($36,299.23)—approximately $11,000 per month—from April 1, 2016 through the date of the default. This provision of the Forbearance Agreement is only activated upon a default by the lessee, or Buca V. Therefore, because the Court denies summary judgment on the question of whether Buca V breached the lease, it also denies summary judgment on the question of whether any of the defendants breached the Forbearance Agreement.

IV. CONCLUSION

Renaissance's motion for partial summary judgment, Doc. No. 24, is DENIED. Within fourteen days of the date of this Order, the parties shall file a joint status report with their joint or separate positions with respect to the schedule for the remainder of this case. The parties shall specifically address their availability to commence the bench trial in this matter on Wednesday, September 18, 2019.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge